JAMES WATSON

*v.*

THE WATSON MANUFACTURING COMPANY.

At the instance of mortgagees of the realty, the court set aside an order directing a receiver of an insolvent corporation to sell, as personal property, certain steam-engines, boilers, shafting, cupolas, radiators and a platform scale, because such articles were fixtures, and covered by the mortgage, not only from the adaptation of the buildings etc. to their erection and use, but also because their severance would greatly depreciate their value and also that of the buildings to which they were attached, and would dismantle the buildings and take away from them essential adjuncts which were placed there to adapt them to the purpose for which they were built and used, and

which, without them, they would not answer.—*Held*, also, that the fact that the owners of the premises had treated such fixtures as personalty, in making up their accounts, in insuring them and in rating them for taxation, could not control the question.

On order to show cause why an order directing the receiver of the defendant, an insolvent corporation, to sell certain steam engines, boilers, &c., as personal property, should not be set aside or modified.

*Mr. H. A. Williams,* for the First National Bank of Paterson.

*Mr. Frederick Frelinghuysen,* for the Equitable Life Assurance Society of the United States.

*Mr. A. B. Woodruff,* for the receiver.

The Chancellor.

In the suit in this court for foreclosure and sale of mortgaged real estate of the defendants, in which the Equitable Life Assurance Society of the United States is complainant, a decree was made directing that the property be sold to pay the money due that society on its mortgage, and also to pay the money due the First National Bank of Paterson on its mortgage.

The mortgaged premises are part of the extensive establishment of the Watson Manufacturing Company in the city of Paterson, wherein it carried on a very large business of manufacturing iron, millwrighting and machinery and bridge and architectural work. All the main brick buildings of the establishment stand thereon. These are the main shop, 192 feet by 56 feet, with a wing 44 feet by 60 feet; the centre building, about 51 feet by 75 feet; the foundry, 150 feet by 86 feet; the pattern-house, 60 feet by 29 feet; the blacksmith-shop, 42 feet by 87 feet; the boiler-house, about 32 feet by 20 feet, and the engine-house, 18 feet

Watson v. Watson Manufacturing Co.

by 34 feet. The receiver being advised and being of opinion that the two steam-engines and boilers, two blowers, two cupolas, some radiators, the shafting and a platform scale, which were in the establishment, were personal property, applied for and obtained an order directing him to sell those articles with other property, unquestionably personal, of the company. The society and the bank now apply to vacate so much of that order as directs him to sell the articles above specified, on the ground that they are part and parcel of the realty.

One of the engines is in the engine-house above mentioned, which is connected with the main building. It weighs, with the fly-wheel, about eight tons, and was put in to drive the machinery of the works. Its power is, high pressure, eighty horse-power; low pressure, one hundred. It is set on a foundation and is held in its place by " holding-down bolts." The engine-shaft extends through the wall of the main building, the wall forming a foundation for the journal-box on the end of the main shaft. The boilers of that engine are two in number and weigh about four tons each. They are in a building on the premises occupied by them alone, and built against the main building. The rear of that building was built up after they were put in. They are bricked over. The power is communicated to the works by the following means : On the extreme end of the engine-shaft is a gear-wheel working into a corresponding wheel on an upright shaft, on which latter shaft are placed wheels at the respective heights of each of the three stories of the building. On the end of the line-shafting in each story are placed wheels which work into the wheels on the upright shaft. The first two or three lengths of line-shafting in each story are run on hangers attached to the floor-beams of the building by bolts, and the rest are held in place on the cast-iron columns which support the floor and roof of the building, a flat surface having been left on the columns for the purpose, and the journal-boxes being secured by screws.

32

The cupolas are circular shells of wrought-iron, lined with fire-brick, are about four feet in diameter for about fifteen feet, and then become narrower, in the shape of a funnel, with the small end upwards. To the top is attached an iron pipe which extends through the roof. They stand on foundations built in the ground. The cranes (they will each carry about ten tons) rest on stone foundations in the centre of the foundry, on which there is a cast-iron step which receives the pivot on which the crane swings, and the upper end of the mast of the crane is held in a cast-iron journal-box bolted to the main rafters of the building.

The platform scale is in the centre building. It is set in a pit of brick work about three feet deep. It was put in to weigh the goods. The radiators are what are known as "Mason radiators." They are connected with the building by steam-pipes, and are attached to the floor by screws to keep them in place. They were put in to warm the building.

The other engine (of about fifteen horse-power) is said to be substantially set, fixed on mason work and held down by bolts, and was for driving the machinery of what is called "the erecting-bridge shop." No evidence is offered as to the blowers.

That all of the articles in dispute were put into the buildings to remain there permanently so long as they were serviceable, there can be no question. It is distinctly proved. They were all necessary to the business there conducted. They were all attached to the realty or something appurtenant thereto, there to remain for the purposes of the business for which the premises were designed and to which they were accordingly adapted. They are of far more value on the premises than they would be if severed from them. For example, the cupolas cost together about $1,000. Taken from the building they would not sell for more than $200, it is said. The main engine and its fixtures cost $7,500, though bought at second-hand. To the premises they are worth for any purpose to which the property would probably

be applied, $2,500.   Separated they would not sell for more
than $1,500.   Apart from injury to the buildings in the
removal, to take these articles out of the buildings would
dismantle them and take away from them the essential
adjuncts which were placed there in order to adapt them to
the purposes for which they were built and used, and which,
without them, they would not answer.   The articles are to
be regarded as part of the realty.   *Quinby* v. *Manhattan Cloth
Co.*, 9 *C. E. Gr.* 260; *Williamson* v. *N. J. South. R. R. Co.*,
2 *Stew.* 311; *Keve* v. *Paxton*, 11 *C. E. Gr.* 107; *Bliss* v. *Whit-
ney*, 9 *Allen* 114; *Arnold* v. *Crowder*, 81 *Ill.* 56.   That it was
intended that the articles in question should be permanent
accessions to the freehold, will admit of no doubt.   Nor does
the fact that the owners dealt with them as personal prop-
erty in their accounts and in insuring them, and that the
assessors, in taxing them, treated them as personal property,
control the question.   Whether they are to be regarded as
personal or real, is to be determined by the following con-
siderations:   Whether they are actually annexed to the
realty or something appurtenant thereto; whether they are
applied to the use or purpose for which that part of the
realty with which they are connected is appropriated, and
whether the party making the annexation intended to make
thereby a permanent accession to the freehold.   *Williamson*
v. *N. J. South. R. R. Co.*, *ubi supra.*   But it is urged, on the
part of the receiver, that there was no unity of title in the
land and the articles in question until long after the mort-
gages of the society and the bank were made; that the
mortgage of the former was given by William G. and James
Watson, who then had the legal title to the land, but who
never owned the articles in dispute, but they were owned by
the Watson Manufacturing Company; and that the mortgage
to the bank was given by the Watson Manufacturing Com-
pany, which then had no title to the land, but did own the
articles.   The fact is, however, that there was essential unity
of title.   The company was the equitable owner of the land,
and in possession of it accordingly, when both mortgages
were made.   *Cooke* v. *Watson*, 3 *Stew.* 345.